**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| BINTELLI, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES; U.S. CUSTOMS AND BORDER PROTECTION; and ERIC CHOY, in his official capacity as Executive Director, Trade Remedy Law Enforcement Directorate, Office of Trade, U.S. Customs and Border Protection,<br><br>*Defendants*. | Court No. 26-03812 |

**COMPLAINT**

Plaintiff Bintelli, LLC ("Bintelli"), by and through its attorneys, brings this civil action for declaratory, injunctive and other appropriate relief against defendants the United States, United States Customs and Border Protection ("CBP"), and Eric Choy in his official capacity (collectively, "Defendants"), and alleges as follows:

**INTRODUCTION**

1. The Fifth Amendment to the U.S. Constitution prohibits deprivation of "life, liberty, or property without due process of law." In this case, however, a federal agency has violated this basic Constitutional right by subjecting U.S. importer Bintelli to business-ending sanctions under Enforce and Protect Act ("EAPA") Case No. 8286 under the guise of offering a futile administrative process later.

2. Worse still, CBP's de facto shutdown order is based on the agency's garbled interpretation of nearly identical facts with respect to the "precise and limited scope" of antidumping and countervailing duty Orders that this Court already has found to be facially

deficient in the context of an EAPA investigation involving the same antidumping and countervailing duty ("AD/CVD") Orders at issue here. *Icon EV LLC v. United States*, Slip Op. 26-42, at 3 (Ct. Int'l Trade April 24, 2026).

3. CBP may not administer EAPA in a manner that "essentially precludes [Bintelli] from vindicating a constitutional right." *Id.* at 6.

4. Yet, CBP has imposed abrupt interim measures on Bintelli that could require Bintelli, which grossed approximately $30 million in revenue last year, to pay more than *$150 million in duties* and a 519.23 percent *ad valorem* rate on imports going forward—all based on a to-be-substantiated "reasonable suspicion of evasion."[1] And this is without providing Bintelli advance notice of the EAPA allegations, without disclosing the basis for its suspicion, and without offering any meaningful pre-deprivation opportunity for Bintelli to answer or be heard.

5. On May 20, 2026, CBP initiated this investigation into Bintelli under EAPA, without Bintelli's knowledge.

6. On August 18, 2026—abruptly and without explanation—CBP informed Bintelli by email that it had determined there was a reasonable suspicion that Bintelli evaded antidumping and countervailing duties and that it was imposing interim measures on Bintelli, threatening to reject past entries and require cash deposits, subjecting the company to live entry requirements and requiring it to pay combined AD/CVD cash deposits of 519.23 percent *ad valorem* on merchandise that is bound to arrive in the United States in the coming days. CBP offered Bintelli no opportunity to be heard before the agency imposed these harsh interim measures. Nor did CBP inform Bintelli

---

[1] CBP has not provided Bintelli with a list of past entries of alleged "covered merchandise" potentially subject to the interim measures. The estimate of potential duty owed for past entries has been calculated with reference to the entered value of the entries from China, Thailand and Vietnam in Bintelli's Automated Commercial Environment data that have been flagged in CBP's system as "extended" coincident with the timing of CBP's investigation.

as to why it had or has any suspicion, let alone a reasonable one, that Bintelli's imports were subject to antidumping or countervailing duties prior to its email.

7. On August 25, 2026, CBP issued its full, albeit redacted, Notice of Initiation of Investigation and Interim Measures ("Notice of Initiation"). CBP still has not released to counsel the unredacted version of the Notice of Initiation under an administrative protective order. The Notice provided more details—replete with erroneous and incomplete information—regarding the interim measures that CBP has imposed on Bintelli, but again without providing prior notice or meaningful opportunity for Bintelli to be heard as to the applicability of such measures.

8. Defendants' actions violate Bintelli's due process rights under the Fifth Amendment to the U.S. Constitution. As this Court has confirmed, CBP must provide an importer with "a meaningful opportunity to respond . . . *before* a temporary deprivation takes effect, not afterwards." *Superior Com. Sols., LLC v. United States*, 811 F. Supp. 3d 1363, 1376 (Ct. Int'l Trade 2025) (emphasis added); *see also Icon*, Slip Op. 26-42, at 12 (holding that Icon "did not receive due process *before* interim measures were imposed") (emphasis added).

9. Had Bintelli been given the opportunity to respond to CBP's ostensible concerns, Bintelli could have shown that its low speed personal transportation vehicle ("LSPTV") frame assemblies, separately imported parts, and LSPTVs do not raise reasonable suspicion justifying interim measures because these imports are plainly not subject to the scope of the AD/CVD Orders. The separately imported parts are non-subject because they were not "rolling chassis" which is the minimum subassembly covered by the scope of the Orders, nor were they imported with rolling chassis. The Vietnamese and Thai LSPTVs are non-subject because they were manufactured in Vietnam and Thailand, respectively, using locally sourced raw steel and/or aluminum components

for the chassis frames. CBP failed to provide this opportunity and instead came to the erroneous conclusion that Bintelli evaded antidumping and countervailing duties.

10. Bintelli will suffer business-ending financial and reputational harm due to the implementation of the interim measures—forcing it to immediately pay a staggering sum of potentially more than $150 million in duties—in violation of its due process rights. Bintelli will be drained financially from the lump-sum retrospective duties, will be unable to import its merchandise, and will lose longstanding business relationships absent an injunction preventing the interim measures from taking effect.

11. This Court should declare CBP's actions unconstitutional, as they exceeded the agency's statutory authority, and should enjoin its imposition of the interim measures.

## PARTIES

12. Plaintiff Bintelli, LLC is a U.S.-based importer of record and distributor of imported merchandise headquartered in Ladson, South Carolina.

13. Defendant the United States is amenable to service through the Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Department of Justice. *See* USCIT Rule 4(h).

14. Defendant U.S. Customs and Border Protection is a federal agency headquartered in the District of Columbia with its principal office located at 1300 Pennsylvania Avenue, N.W., Washington, D.C. CBP is an agency within the Department of Homeland Security, an executive branch department. CBP is charged with enforcing EAPA, including by imposing interim measures.

15. Defendant Eric Choy is sued in his official capacity as Executive Director in the Office of Trade's Trade Remedy Law Enforcement Directorate ("TRLED") at CBP. In that

capacity, he has the ultimate responsibility for the actions of TRLED, including the imposition of interim measures under EAPA. He maintains an office at 1331 Pennsylvania Avenue, N.W., Washington, D.C.

## JURISDICTION

16. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(i)(1)(D), which confers "exclusive jurisdiction" over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . administration and enforcement with respect to the matters referred to in . . . subsections (a)-(h) of this section."

17. This civil action challenges CBP's imposition of interim measures under section 517 of the Tariff Act of 1930 (19 U.S.C. § 1517(e)), which provides for "administration and enforcement with respect to the matters referred to in [subsection (c)]" of 28 U.S.C. § 1581. *Id.* § 1581(i)(1)(D).

18. Jurisdiction under 28 U.S.C. § 1581(i) is appropriate here because any remedy provided under 28 U.S.C. § 1581(c), which may otherwise provide for judicial review of interim measures, "would be manifestly inadequate." *Hylsa v. United States*, 22 C.I.T. 44, 46 (1998). As this Court has recognized, the earliest that a final determination would be available for judicial review under section 1581(c) is 300 days following CBP's initiation of an EAPA investigation—which, in Bintelli's case, would be on or about March 16, 2027. *ICON EV LLC v. United States*, No. 26-02759, Slip Op. 26-42, at 9 (Ct. Int'l Trade Apr. 24, 2026); *see also ICON EV LLC v. United States*, No. 26-02759, Slip Op. 26-55, at 11 (Ct. Int'l Trade May 26, 2026); 19 U.S.C. § 1517(c), (f) (providing CBP with up to 360 days from initiation to issue an evasion determination and 60 days from the filing of an administrative appeal to review the determination). By then, Bintelli will

be extinct. Because Bintelli "may not even exist to challenge the final determination" and the fact that "there are no procedures that [Bintelli] can use to challenge Customs' imposition of interim measures with no notice," section 1581(c) jurisdiction is inadequate. *ICON*, Slip Op. 26-42, at 9; *see also ICON*, Slip Op. 26-55, at 11-12.

19. This Court also has jurisdiction under 28 U.S.C. § 2640(e), which provides for review of agency action.

## BACKGROUND

20. Bintelli is a U.S.-based manufacturer and distributor of power sport products, specializing in electric vehicles including golf carts, known as low speed personal transportation vehicles under the scope of the subject AD/CVD Orders. Justin Jackrel ("Jackrel") founded the company in 2005, building on his prior experience working with electric and gas scooters while he was still in high school. Along with his joint owner and good friend, Jason Perske ("Perske"), Jackrel has built the company from the ground up, transforming it into an internationally recognized and award-winning brand.

21. In 2015, Bintelli expanded its operations to its current headquarters in Ladson, South Carolina. The company operates a 498,000 square foot total assembly facility and employs 146 people, 60 of whom have been hired in the past year. In addition, Bintelli's merchandise is sold by a network of more than 200 dealers based throughout the United States. Besides creating jobs, Bintelli contributes to its local community through numerous charitable endeavors, including the donation of more than 100,000 meals to Lowcountry Food Bank in an effort to fight hunger throughout South Carolina. Bintelli also supports the charities Charleston Humane Society, Operation BBQ Relief, and Lasagna Love.

22. Bintelli maintains a strong foothold in the LSPTV and golf cart industry. In 2025, for the second year in a row, Bintelli won awards for the Best Golf Cart Brand and Best LSV/Street Legal Golf Cart in Golf Cart Resource's Best Of Awards, as voted on by consumers nationwide. Bintelli has also been recognized six times by *Inc.* magazine, which publishes an annual list ranking the 5,000 fastest-growing private, for-profit companies in the United States, and five times as a Gator100 company, a designation given to 100 of the world's fastest growing University of Florida-affiliated businesses.

23. In August 2025, the U.S. Department of Commerce ("DOC") issued AD/CVD Orders on LSPTVs from the People's Republic of China ("China"). *Certain Low-Speed Personal Transportation Vehicles From the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order; Amended Final Determination of Countervailing Duty Investigation and Countervailing Duty Order*, 90 Fed. Reg. 38,759 (Aug. 12, 2025) ("Orders").

24. The Orders cover finished LSPTVs of Chinese origin, as well as certain unfinished or unassembled LSPTVs of Chinese origin, defined by the Order's Scope as:

> An unfinished and/or unassembled LSPTV subject to these orders covers **<u>at a minimum</u>** a subassembly, also known as a "rolling chassis," which is typically comprised of, but not limited to, a frame or body with front and/or rear suspension components (such as arms, springs, axles, spindles, and shafts) installed and powertrain components (including either an electric motor or a gas-powered internal combustion engine) installed or ready for installation.
>
> When imported together with a rolling chassis subject to these orders, other LSPTV components, such as batteries, bumpers, wheel and tire assemblies, cowlings, fenders, grills, kick plates, steering column and steering wheel assemblies, dash assembly, seat assemblies, pedal assemblies, brake assemblies, canopy or roof assemblies, temporary rain enclosures, windshields, mirrors, headlights, taillights, lighting systems, or storage—whether assembled or unassembled, whether as part of a kit or not, and whether or not accompanied by additional components—constitute part of an unfinished and/or unassembled LSPTV that is subject to these

> orders. The inclusion of other products, components, or assemblies not described here does not remove the product from the scope. . . .
>
> LSPTVs and subassemblies subject to these orders include those that are produced in the subject country whether assembled with other components in the subject country or in a third country. Processing or completion of finished and unfinished LSPTVs and subassemblies either in the subject country or in a third country does not remove the product from the scope.

*Id.*, 90 Fed. Reg. at 38,763 (emphasis added).

25. These Orders do not cover Bintelli's imported merchandise subject to CBP's purported finding of a reasonable suspicion of evasion.

26. During the EAPA period of investigation (*i.e.*, September 7, 2024 to the present), Bintelli imported parts and components from China that did not amount to a minimum covered subassembly pursuant to the scope, and were thus non-subject, as well as finished LSPTVs from Vietnam and Thailand.

27. The parts and components, sourced from Yangzhou Whanlong Electric Vehicle Co. ("Whanlong") and Dongguan Excar Electric Vehicle CO., Ltd. ("Excar"), were either used for replacement parts or to produce LSPTVs/golf carts in the United States utilizing parts and components that were not imported together on the same bill of lading as a rolling chassis at Bintelli's U.S. assembly facilities.

28. Specifically, Bintelli imported Chinese LSPTV frames without any powertrain or suspension components installed or ready to install, *i.e.* these imports did not meet the minimum covered subassembly of a rolling chassis. A rolling chassis is defined as the minimum covered subassembly, including "frame or body with front and/or rear suspension components (such as arms, springs, axles, spindles, and shafts) installed and powertrain components (including either an electric motor or a gas-powered internal combustion engine) installed or ready for installation." Orders, 90 Fed. Reg. at 38,763.

29. Separately, Bintelli also imported other components, including motors, suspension, and other parts, in other shipments on separate bills of lading and customs entries. These imports did not meet the requirements of a minimum covered subassembly either.

30. Beginning in 2024, Jackrel and Perske worked tirelessly in partnership with Bintelli's existing overseas partners Whanlong and Excar to reduce supply chain reliance on China. Bintelli partnered with RMA Automotive Company Limited ("RMA") in Thailand and Feiteng Electric Vehicle Company ("Feiteng") in Vietnam to ensure that its supply chain complied with the Orders. Bintelli and its senior leadership expended a tremendous amount of human and financial capital to train these companies' employees and ensure their facilities were properly equipped to support the magnitude and quality of Bintelli's merchandise.

31. After months of effort, in July 2025, Bintelli began importing Thai-origin LSPTVs from RMA and Vietnamese-origin LSPTVs from Feiteng. Each of the shipments Bintelli receives contains a Certificate of Origin from the respective country, as both Vietnam's and Thailand's governments prescribe their own procedures and conduct their own inspections to ensure the LSPTVs meet their country's standards.

32. These LSPTVs are comprised of a significantly higher percentage of in-country components from either Vietnam or Thailand than required, depending on the country of origin, plus *all* labor for manufacturing and assembly. This includes the frame (i.e., the chassis) that is of Thai or Vietnamese origin, produced from Thai steel or Vietnamese aluminum, respectively. Bintelli gave the government bills of materials listing the origin of each material used to produce the golf carts as well as purchase records for those raw materials in its Requests for Information ("CF 28") responses.

33. Notwithstanding the above, Bintelli understands that origin for customs purposes and origin for purposes of the Orders may be distinct. Accordingly, Bintelli has worked tirelessly in conjunction with experienced U.S. trade remedy counsel that represented Bintelli throughout the investigation to ensure that Bintelli's imports are not subject to the scope of the Orders.

34. Bintelli's merchandise therefore does not "at a minimum" contain a Chinese-origin rolling chassis, as the Orders require. *See* Orders, 90 Fed. Reg. at 38,763.

35. Bintelli has consistently and transparently worked with CBP to demonstrate compliance with the requirements of the scope of this case. In May 2025, while provisional measures were in place but before the Orders were imposed, Bintelli received notices from CBP that the agency was rejecting several entries that allegedly were subject to AD/CVD duty deposits. At the request of counsel, CBP rescinded the rejections and issued CF 29 Notices of Proposed Action requesting that Bintelli demonstrate that its imported parts were not rolling chassis or, alternatively, refile the entries as Type 03 subject to the scope of the then-investigation on *LSPTVs from China*. On June 3, 2025, Bintelli's counsel sent a letter to CBP providing the agency with evidence, including detailed sales documentation and photographs, to support its assertion that the entries did not fall within the scope because none of the merchandise consisted of rolling chassis. Ex. A, June 3, 2025 Letter to CBP Regarding CF 29 Response (exhibits omitted). As Bintelli explained in its response to the CF 29, this merchandise was not subject because none of it comprised a "rolling chassis," which was the minimum subassembly covered by the scope of the investigation (and eventual Orders). Rather, Bintelli explained, the merchandise was used to produce rolling chassis in the United States. Based on the information supplied, CBP ultimately agreed with Bintelli and liquidated the subject merchandise as Type 01. Then, in January 2026, after the Orders were imposed, CBP challenged one of the entries that was previously addressed

in Bintelli's June letter. Ex. B, Jan. 23, 2026 D. Wilson Email to CBP Regarding 29 CF Response. Bintelli's counsel promptly emailed CBP, referencing its prior analysis in its June letter to explain why the Orders should not apply to the entry. Again, CBP agreed with Bintelli and ultimately accepted the entry without the imposition of the AD/CVD duties. *Id.*, Feb. 4, 2026 Response from F. Orozco.

36. Further, in June and July 2026, CBP issued several CF 28s to Bintelli, questioning the origin of Bintelli's imported LSPTVs. Bintelli responded to each of these requests with manufacturing and production information demonstrating that the LSPTVs were Vietnamese-origin and Thai-origin, respectively. Ex. C, Aug. 3, 2026 Letter Response to CF 28 (FTE Vietnam Origin); Ex. D, Aug. 3, 2026 Letter Response to CF 28 (RMA Thailand Origin). These responses included, *inter alia*, raw material purchase orders and invoices, production records, work instructions, production process flowcharts and production records, and Certificates of Origin.

37. Despite this consistent cooperation and CBP's determinations that Bintelli's entries were not subject to the AD/CVD Order, on August 18, 2026, TRLED emailed Bintelli stating: "based on a review of available information, [CBP] has determined that there is reasonable suspicion of evasion of antidumping (AD) and countervailing (CVD) duties by Bintelli LLC," among other importers, "by failing to declare entries of Chinese-origin covered LSPTV subassemblies and their component parts and by transshipment through Vietnam and/or Thailand." Ex. E, TRLED Email Regarding EAPA Cons. Investigation 8286 - Notice of Investigation and Interim Measures. CBP did not explain in this email, however, what information caused it to find an ostensible "reasonable suspicion of evasion" of these duties.

38. Subsequently, TRLED notified Bintelli that CBP "shall" implement the following interim measures:

- Extend liquidation of unliquidated entries that entered before the date of initiation of the investigation (May 20, 2026);
- Suspend liquidation of unliquidated entries entered on or after the date of initiation of the investigation, May 20, 2026, and reject any entry summaries and require a re-file for those entries that are within the entry summary reject period;
- Take such additional measures as CBP deems necessary, including requiring a single transaction bond or additional security or the posting of cash deposits with respect to covered merchandise;
- Require "live" entry for all future imports of LSPTV from China and Vietnam and/or Thailand by the Importers, requiring the Importers to submit proper documentation and all duties prior to release of the merchandise; and
- The AD/CVD rates are the "all others" rate for A-570-176 and C-570-177 on LSPTV and parts, if the U.S. Department of Commerce has not determined a separate rate that would apply to that entry.

39. If CBP requires payment of cash deposits on all entries covered by the EAPA POI, the interim measures effectively would require Bintelli to immediately pay CBP millions of dollars for prior imports filed during the period identified—a potential sum of more than $150 million—and also pay millions of dollars in cash deposits, based on a rate of approximately 519 percent, for entries from Thailand and Vietnam that are destined to arrive in the United States in a matter of days.

40. These measures were imposed *before* Bintelli was made aware of the basis for CBP's alleged "reasonable suspicion of evasion" or the grounds for the EAPA allegation that generated CBP's determination. Bintelli received no notice that an EAPA allegation had been

received by CBP, that CBP had commenced an EAPA investigation of Bintelli, or that CBP was contemplating imposing interim measures. The CF 28s that Bintelli received in June and July 2026 related to specific entries, did not mention any EAPA allegation, any EAPA investigation, or any potential interim measures. There was no indication from these CF 28s addressing a few of Bintelli's entries that CBP had received an EAPA allegation, that an EAPA investigation was then ongoing, or that CBP was contemplating imposing interim measures on many of Bintelli's entries.

41. Had Bintelli been informed that CBP had received an EAPA allegation, that an EAPA investigation was ongoing, or that CBP was contemplating imposing interim measures, it could have provided even further comprehensive, exhaustive documentation showing that Bintelli's merchandise contains a significant Vietnamese and Thai material content, more than 50%, including Vietnamese and Thai frames such that these imports simply could not meet the minimum covered assembly of a rolling chassis which is defined in the scope as a Chinese frame, suspension, and powertrain installed or ready for installation, since at least July 2025.

42. Had Bintelli been informed that CBP had received an EAPA allegation, that an EAPA investigation was ongoing, or that CBP was contemplating imposing interim measures, it could have stopped imports of its merchandise and avoided the imposition of millions of dollars in AD/CVD duties.

43. CBP did not provide Bintelli with any notice nor a meaningful opportunity to respond before CBP imposed interim measures. CBP issued its Notice of Initiation on August 25, 2026. Ex. F, Aug. 25, 2026 TRLED Letter Regarding Notice of Initiation of Investigation and Interim Measures – EAPA Cons. Case 8286. This Notice of Initiation, however, was redacted and did not contain the exhibits that CBP referenced. To date, CBP has not provided counsel for Bintelli with a complete, unredacted version of the Notice of Initiation. This leaves Bintelli further

hamstrung and unable to evaluate the full scope of CBP's EAPA allegations or defend itself against them. In other words, Bintelli still does not have full notice of the purported violations that CBP is claiming, and it never had an opportunity to rebut those allegations before CBP levied more than $150 million in interim measures against it.

44. The Notice of Initiation was based on outdated and inaccurate information. The Notice of Initiation does not acknowledge that CBP had previously agreed that entries of Bintelli's merchandise were not subject to the antidumping or countervailing duty Orders. The Notice of Initiation does not state that CBP informed Bintelli of any EAPA allegations, any EAPA investigation, or the possible implementation of interim measures.

45. Instead, the Notice of Initiation reveals that CBP has packaged erroneous and misleading information into sweeping generalizations amounting to alleged "reasonable suspicion of evasion." The errors and mischaracterizations in the Notice of Initiation are many; but the following are emblematic.

46. CBP points to Bintelli's allegedly incomplete CF 28 responses as justification that its "reasonable suspicion finding is supported," contending there are "unresolved questions regarding Vietnamese and Thai frame or chassis production" and "insufficient tracing of raw material inputs(.)" *Id.* at 19. In other words, CBP is relying on a purported lack of information to find reasonable suspicion. To do so, however, CBP ignores that Bintelli provided sufficient information and evidence in its CF 28 responses to affirmatively demonstrate that its merchandise is all Vietnamese or Thai origin and does not fall under the Orders.

47. For example, CBP questions Bintelli's Thai manufacturer RMA because "Google maps and other open-source information confirm the facility is primarily used for assembly and distribution, not for the manufacture of new vehicles from raw materials or component

fabrication." *Id.* at 9. But Bintelli provided extensive data and documentation to CBP showing the actual operations at the Thai plant, including welding of frames from Thai-origin steel that is bent, welded, and formed into these frames.

48. Bintelli also has demonstrated to CBP in its CF 28 responses that the Vietnamese manufacturer Feiteng similarly produces Vietnamese-origin products for Bintelli. In fact, throughout June and part of July 2026, Bintelli's Vietnamese manufacturing factory was shut down, as an "anonymous source" accused Feiteng of evasion and transshipping. Thirty-two containers in port in Vietnam were temporarily seized by the Vietnamese government. Each was fully inspected and not a single transshipped golf cart was found. The Vietnamese government also inspected the factory and oversaw manufacturing for multiple days. Ultimately, the Vietnamese government concluded that the factory was operating legally and the products shipped met the requirements to qualify as Vietnamese-origin products. Bintelli resumed shipping with legal Certificates of Origin.

49. CBP also bases its reasonable suspicion finding on incorrect information. For example, CBP refers to an allegation "that Bintelli has engaged in evasion by misclassifying LSPTVs and related subassemblies under incorrect HTSUS codes, including those designated for golf balls and golf equipment." *Id.* at 6. But there is no evidence in Bintelli's customs data which CBP has direct access to that it ever used HTSUS codes for golf balls and golf equipment when importing golf cart merchandise and Bintelli categorically denies ever having done so.

50. CBP also points to ordinary course commercial dealings that have nothing to do with how duties are imposed or triggered under the Orders. CBP points to "*pro forma* invoices showing the continued involvement of [a company] in transactions involving carts purported to have been produced in Thailand," alluding to a company in China. *Id.* at 19. But this is immaterial

because origin and coverage under the scope of the Orders do not turn on the nationality of the invoicing party. It is the country of origin of the actual good that matters—and Bintelli has Certificates of Origin confirming that its products are sourced from Vietnam and Thailand, and more significantly that any imported Chinese parts and components did not amount to a minimum subassembly covered by the Orders. Moreover, Bintelli fully disclosed in its CF 28 responses that a Chinese party was part of the transaction.

51. The interim measures that CBP imposes will, if not enjoined by this Court, drive Bintelli's more than 20-year-old company completely out of business within a matter of weeks. Bintelli cannot offset the continuing cost of the interim measures by cutting expenses, passing costs on to its dealers or customers, or moving production elsewhere. The interim measures have already caused, and will continue to cause, Bintelli to lose goodwill, business opportunities, and its strong reputation within the industry, losses which cannot be recovered from the government. Simply put, Bintelli will be forced to shut down its business if these interim measures are not enjoined.

## COUNT I

### CBP's Failure to Provide Notice and an Opportunity to be Heard Violated Bintelli's Due Process Rights Under the Fifth Amendment

52. Bintelli realleges and incorporates by reference each of the preceding paragraphs and allegations.

53. The Fifth Amendment prohibits the "depriv[ation] of life, liberty, or property, without due process of law." U.S. Const. amend. V.

54. Under the due process clause of the Fifth Amendment, CBP must provide Bintelli with notice and a meaningful opportunity to be heard before it imposes interim measures depriving

Bintelli of a property interest. *Superior Com. Sols.*, 811 F. Supp. 3d at 1376 (citing *Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250, 1257 (Fed. Cir. 2023)).

55. To determine whether sufficient process has been provided, courts weigh the private interest at stake, the risk of erroneous deprivation through the procedures used, and the public interest. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Under this balancing test, it is clear that Bintelli did not receive the process it was due.

56. First, "the private interest that will be affected by" CBP's action is significant. *Id.* at 335. The "degree of potential deprivation" is high here because the interim measures will force Bintelli out of business and Bintelli is unable to "ameliorate the interim loss." *Id.* at 341. Moreover, Bintelli has a legitimate property interest in the proper assessment of duties on goods already imported and those en route to the United States.

57. Second, the risk of erroneous deprivation is also high. CBP's determination of reasonable suspicion is unfounded because it is based on erroneous or incomplete information and is grounded in allegations submitted by interested parties, such as commercial competitors, rather than "unbiased" parties. *Id.* at 344. Moreover, Bintelli provided CBP with evidence and information that it imported parts and components from China that did not amount to a minimum covered subassembly pursuant to the scope of, and were thus not subject to, the Orders, and finished LSPTVs from Vietnam and Thailand comprised of a chassis that were of Thai or Vietnamese origin, produced from Thai or Vietnamese raw components, and were thus not subject to the Orders.

58. Finally, the public interest is not benefited by depriving importers of an opportunity to be heard before the imposition of interim measures. Allowing Bintelli to submit evidence prior to imposing interim measures is likely to impose few "fiscal and administrative burdens" that CBP

is not already accounting for, considering the measures are imposed alongside an investigation involving documentary evidence and submissions. *Id.* at 335.

59. CBP never afforded Bintelli notice and an opportunity to be heard before imposing its interim measures. Bintelli was not made aware of an EAPA allegation, the initiation of an EAPA investigation on May 20, 2026, or the possibility of the implementation of interim measures that CBP initially communicated on August 18, 2026.

60. Because CBP failed to provide Bintelli with the requisite notice and a meaningful opportunity to be heard before imposing the interim measures depriving Bintelli of a property interest, CBP violated Bintelli's due process rights under the Fifth Amendment and the interim measures should be enjoined as unlawfully imposed.

**COUNT II**

**CBP's Application of the Reasonable Suspicion Standard Violated Bintelli's Due Process Rights Under the Fifth Amendment**

61. Bintelli realleges and incorporates by reference each of the preceding paragraphs and allegations.

62. On August 18, 2026, based on "reasonable suspicion" of evasion, CBP informed Bintelli that it was imposing interim measures under 19 U.S.C. § 1517(e)(3).

63. These interim measures effectively bar Bintelli from importing its Vietnamese- and Thai-origin merchandise into the United States, cutting off a critical source that Bintelli needs to assemble electric vehicles for sale in the U.S. market and forcing Bintelli on the path to extinction within weeks.

64. Given the enormity of the business-ending impact on Bintelli and the high risk of erroneous deprivation, the low standard of reasonable suspicion cannot be sustained under the Fifth Amendment as applied to Bintelli. *See Mathews*, 424 U.S. at 335-48.

65. Because CBP's application of the reasonable suspicion standard as to Bintelli violated the Fifth Amendment, the interim measures it imposed against Bintelli should be enjoined as unlawfully imposed.

**COUNT III**

**CBP Violated 19 U.S.C. § 1517(e)**

66. Bintelli realleges and incorporates by reference each of the preceding paragraphs and allegations.

67. 19 U.S.C. § 1517(e) requires CBP to have "reasonable suspicion" that covered merchandise entered into the United States through evasion prior to imposing interim measures.

68. CBP's suspicion of evasion on the part of Bintelli was not reasonable. The evidence CBP relied on was insufficient to meet this standard or was otherwise erroneous or irrelevant. CBP did not consider its own analyses underlying its prior decisions to refrain from taking action related to Bintelli's Vietnamese- and Thai-origin frame assemblies. Nor did it consider that imports of (i) those frame assemblies, (ii) complete LSPTVs of Vietnamese- and Thai-origin, and (iii) Chinese parts that do not amount to a rolling chassis are plainly not subject to the scope of the Orders. Moreover, CBP ignored information and evidence that Bintelli provided while CBP was conducting its investigation (although Bintelli did not know it was being investigated) demonstrating that its merchandise did not come within the ambit of the Orders.

69. Because CBP lacked a sufficient basis for reasonable suspicion regarding Bintelli's imports of frame assemblies, the interim measures it imposed against Bintelli should be enjoined as unlawfully imposed.

**PRAYER FOR RELIEF**

For the foregoing reasons, Bintelli respectfully asks this Court to:

a) Declare CBP's imposition of interim measures unlawful;

b) Enjoin the interim measures both permanently and, at a minimum, until such time as Bintelli has an opportunity to be heard on this matter;

and

c) Grant such other and further relief as the Court deems appropriate.

Dated: August 28, 2026

Respectfully submitted,

*/s/ Daniel R. Wilson*

Daniel R. Wilson
Carolyn Bethea Connolly
Faegre Drinker Biddle & Reath LLP
1500 K Street, N.W., Ste. 1100
Washington, DC 20005
Phone: (202) 230-5000
Fax: (202) 842-8465
daniel.wilson@faegredrinker.com
carrie.connolly@faegredrinker.com

Lawrence G. Scarborough
Jovana Crncevic
Faegre Drinker Biddle & Reath LLP
1177 Avenue of the Americas, 43rd Floor
New York, New York 10036
Phone: (212) 248-3140
Fax: (212) 248-3141
lawrence.scarborough@faegredrinker.com
jovana.crncevic@faegredrinker.com

*Counsel for Plaintiff Bintelli, LLC*